**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| THE REDEEMED CHRISTIAN CHURCH OF GOD, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-17-1670 |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | § § § | |
| Defendant. | § § | |

**MEMORANDUM & OPINION ON THE
CROSS MOTIONS FOR SUMMARY JUDGMENT**

The Redeemed Christian Church of God brought this lawsuit seeking judicial review and reversal of the agency action denying the Church's I-360 visa petition filed on behalf of its minister, Joel Onyema Uzoma. The Church moved for summary judgment that the decision by the United States Citizenship and Immigration Services to deny the visa petition was arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 501 *et seq.* (Docket Entry No. 22). The government responded and cross-moved that the decision was consistent with the Act. (Docket Entry No. 25). The court held a hearing at which counsel presented argument. (Docket Entry No. 26). Based on the motions and the response, the administrative record, the arguments of counsel, and the applicable law, the court denies the Church's motion for summary judgment and grants the government's cross-motion. Final judgment is entered by separate order. The reasons are analyzed below.

I.      **Background**

    A.      **The Special Immigrant Visas for Religious Workers**

1

To obtain an immigrant religious-worker visa, the worker's employer must file a Form I-360. 8 C.F.R. § 204.5(m). Under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, an I-360 immigrant visa for "special immigrant religious work" is available to ministers and other religious workers operating in either a professional or nonprofessional capacity in a religious vocation or occupation. *See* 8 U.S.C. § 1101(a)(27)(c); 8 C.F.R. § 204.5(m)(2).

The I-360 petition the Church filed on Uzoma's behalf invoked 8 U.S.C. § 1101(a)(27)(C), which defines "special immigrant," as follows:

(27) The term "special immigrant" means–

. . .

    (C) an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who–

        (i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

        (ii) seeks to enter the United States–

            (I) solely for the purpose of carrying on the vocation of a minister of that religious denomination,

            (II) before September 30, 2015, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or

            (III) before September 30, 2015, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of the Internal

> Revenue Code of 1986 [26 USCS §
> 501(c)(3)]) at the request of the
> organization in a religious vocation or
> occupation; and
>
> (iii) has been carrying on such vocation, professional
> work, or other work continuously for at least the
> 2-year period described in clause (i)[.]

8 U.S.C. § 1101 (a)(27)(C).

The regulations require religious employers to provide specific information with the I-360

petition showing the alien's eligibility for classification as a special immigrant religious worker.

The regulation states:

> (m) Religious workers. This paragraph governs classification of an
> alien as a special immigrant religious worker as defined in section
> 101(a)(27)(C) of the Act and under section 203(b)(4) of the Act. To
> be eligible for classification as a special immigrant religious worker,
> the alien (either abroad or in the United States) must:
>
> > (1) For at least the two years immediately preceding
> > the filing of the petition have been a member of a
> > religious denomination that has a bona fide non-profit
> > religious organization in the United States.
> >
> > (2) Be coming to the United States to work in a full
> > time (average of at least 35 hours per week)
> > compensated position in one of the following
> > occupations as they are defined in paragraph (m)(5) of
> > this section:
> >
> > > (i) Solely in the vocation of a minister
> > > of that religious denomination;
> > >
> > > (ii) A religious vocation either in a
> > > professional or nonprofessional
> > > capacity; or
> > >
> > > (iii) A religious occupation either in a
> > > professional or nonprofessional
> > > capacity.

(3) Be coming to work for a bona fide non-profit religious organization in the United States, or a bona fide organization which is affiliated with the religious denomination in the United States.

(4) Have been working in one of the positions described in paragraph (m)(2) of this section, either abroad or in lawful immigration status in the United States, and after the age of 14 years continuously for at least the two-year period immediately preceding the filing of the petition.

8 C.F.R. § 204.5(m). The "petitioning organization"—the religious employer—must certify in the petition that it is a "bona fide religious organization" or affiliate; that "the alien has worked as a religious worker for the two years immediately preceding the filing of the application and is otherwise qualified for the position offered"; and that "the alien has been a member of the denomination for at least two years immediately preceding the filing of the application." 8 C.F.R. § 204.5(m)(7). The employer must certify that "the alien will not engage in secular employment." *Id.* The employer must file evidence showing that it is a religious denomination or affiliate and that the employee is religiously qualified, as well as evidence of the religious employee's compensation and prior employment." 8 C.F.R. § 204.5(m)(8)–(12).

## 2. Uzoma's Visa

The relevant facts are undisputed. Uzoma first came to the United States in October 2003 as a "nonimmigrant for pleasure." His authorization to stay in the United States expired in April 2004. In November 2003, the Redeemed Church of God filed an I-129 Petition for Nonimmigrant Worker on Uzoma's behalf. The I-129 was approved that same month, granting Uzoma permission to stay in the United States from November 2003 to November 2006. As part of his approval,

Uzoma was authorized to work within the limits and authorized period stated in the petition. Any change in employment required a new petition.

In April 2006, the Redeemed Church filed an I-360 petition for a Special Immigrant Religious Worker visa for Uzoma at a USCIS office in California. USCIS denied that petition in February 2009. The Church appealed and the Administrative Appeals Office remanded in January 2010 for further action. The USCIS again denied the petition and certified the case for appeal in October 2010; the AAO denied the appeal in September 2012; and the Church moved to reopen the petition in October 2012. In May 2013, the AAO denied the motion to reopen. The Church filed suit in this court in August 2013, seeking a declaratory judgment that the petition was approvable and that Uzoma was a full-time religious worker. In May 2016, the court remanded to the AAO for further review.

In October 2016, the AAO dismissed the appeal. In November 2016, the Church appealed again. The AAO denied this appeal in May 2017. At that point, the Church filed this lawsuit seeking judicial review of the AAO's decision.

Between 2006, when the Church filed its I-360 petition for Uzoma, and the first denial in February 2009, Uzoma had an encounter with Customs and Border Patrol in Houston in March 2008. He was found with several credit cards and identification forms and documents, including the following items:

- a business card for "SiTech (Nigeria) Limited (Advanced Information Technology Connectivity)," an "IBM Business Partner," identifying Uzoma as the "Managing Director";

- a GE Money Bank Credit Card for "Joel O Uzoma" for the business "Sew Vac Direct";

- a Washington Mutual Credit Card for "Joel Onyema Uzoma" for the business

"Heph Technology Services," valid through June 2010;

- a Bank of American Platinum Business Check Card for "Joel Onyema Uzoma" for the business "Cute Apparels," valid through October 2010;

- a Dell Preferred Account card for "Joel Uzoma," indicating he had been a member since November 2006;

- a copy of a Washington Mutual Incoming Wire Transfer Notice, showing that Caller Spring Nig(eria) Ltd. Transferred $6,941.94 to Hedh (sic) Technology Services on August 23, 2007, labeled "for purchase of notebook computers less charges";

- a copy of a Washington Mutual Confirmation of Domestic Wire Transfer Order, showing that Heph Technologies transferred $13,301.76 to Dell Marketing LP in September 2007, ordered by Joel Onyema Uzoma;

- a copy of a Washington Mutual Business Checking Account statement for October 2007, showing an inbound wire transfer deposit on October 22 for $1,838; deposits of $2,000 on October 1, $1,200 on October 18, and $795 on October 26; withdrawals of $1,800 on October 9, $1,900 on October 23, and a transfer withdrawal for $300;

- a copy of a Washington Mutual Incoming Wire Transfer Notice showing that Caller Spring Nig(eria) Ltd. transferred $9,975 to Heph Technology in December 2007 "for computers less charges";

- a copy of a Dell order confirmation dated December 14, 2007 showing that Joel Uzoma of Heph Technology Servicies ordered 4 computers for $3,217.20;

- a copy of a Washington Mutual Incoming Wire Transfer Notice showing that Caller Spring Nig(eria) Ltd. transferred $6,792 to Heph Technology Services on December 31, 2007 "for computers less charges";

- a copy of a Dell order confirmation page dated February 2008, showing that Joel Uzoma of Heph Technology Services ordered 40 computers for $31,285.56;

- copies of a Washington Mutual Domestic Wire Application and Wire Transfer Notice indicating that Heph Technologies transferred $31,285.56 to Dell Marketing LP in February 2008 listing Joel Onyema Uzoma as the authorized representative; and

- a copy of a Washington Mutual Business Checking Account statement for December 2007 showing inbound wire transfers of $9,975 on December 13

and $6,792 on December 31.

(AR 1304–1305).  When a Customs and Border Patrol agent asked Uzoma about the business credit cards, he explained that his wife owned a clothing business sewing and designing items, and that he and his friend, John Baptiste Sekumade, were partners in a business called Heph, buying computers and sending them overseas.  Uzoma had registered Heph as a business in June 2007.  Uzoma also explained that he did not consider either business to be "work" because he did them in his spare time.  Customs and Border Patrol asked Uzoma how much money he made from Heph.  He responded that he had recently shipped 20 computers and received two wire transfers, one for $9,975 and one for $6,782.

Based on this information, Customs and Border Patrol determined that Uzoma had violated his visa by engaging in unauthorized secular employment.  Uzoma was fingerprinted and served with a Form I-862 Notice to Appear for removal proceedings.  Because the Form I-862 had the wrong address for Uzoma, the form was rejected and removal proceedings did not begin.  Customs and Border Patrol sent Uzoma new Notices to Appear on August 20, 2008 and December 16, 2009, but they were returned undelivered.

After the March 2008 encounter, in October 2008, USCIS sent the Church a Notice of Intent to Deny the I-360 Petition, explaining that Uzoma's "Heph Technology Services" business violated his status.  The Church responded to the Notice in November 2008.  The response included a letter from the Church's Secretary of the Board of Trustees, Oliver Eziuku, stating:

> Heph Technology Services came into being on in July 2007 when a friend of the beneficiary in Nigeria requested that the beneficiary should help him buy some computers in the U.S. and ship them to him in Nigeria.

(AR 470).

In 2010, the Church responded to a second Notice of Intent to Deny the I-360 Petition. The Church included a sworn affidavit from Emeka Okoronkwo, which stated:

> I have been in IT business since 1996 and when I wanted to Increase My Business in 2007 I contacted the said Pastor JOEL ONYEMA UZOMA to help procure some of this computer however, I could not raise the money that was required for the transaction, so I pleaded with him to help me procure the DELL NOTEBOOKS which I had already Secured Market for. I had asked him to loan me money and 3weeks after I have received and sold the DELL NOTEBOOKS, I would return the money to him [sic]

(AR 220). The USCIS denied the I-360 visa application in October 2010, noting that both Okoronkwo and the Church had stated that Heph began operating in 2007, but the Texas Public Records indicated that Uzoma had registered Heph as early as September 2004.

The Church's October 2010 brief to the AAO stated:

> The beneficiary therefore registered Heph Technology in September 2004 to make the purchase. . . . Heph Technology was never used or operated as a business between September 14, 2004 and December 9, 2005. Because the beneficiary did not operate this business name for one day during the period, [Uzoma] completely forgot about it hence this period was not mentioned in the previous response . . .

(AR 168).

In May 2016, the court considered the Church's motion for summary judgment. The Church argued that USCIS had acted arbitrarily and capriciously by not considering the testimonial evidence the Church presented. This court remanded to USCIS, instructing that:

> the agency should clarify whether it considered the testimonial evidence the Redeemed Church submitted in response to the Appeal Office's remand order. If not, the agency should reevaluate its conclusion that Uzoma intended to profit from the computer sale in light of that evidence. Some questions are whether the Sekumade and Okoronkwo affidavits are credible, and whether the credible testimonial and documentary evidence together meet the Church's

> burden. Neither was addressed, contributing to this court's finding of
> arbitrary and capricious agency action.

*Redeemed Christian Church of God v. U.S. Citizenship & Immigration Servs.*, No. H-13-2170, U.S.

Dist. LEXIS 69042, at *41 (S.D. Tex. May 26, 2016).

On October 18, 2016, the AAO dismissed the appeal, stating that the evidence showed that

Uzoma had engaged in secular employment when he made four computer shipments to Nigeria,

intended for resale, between August 2007 and March 2008. (AR 61). The AAO noted that Uzoma

had registered three businesses: Heph in 2004, Cute Apparel in 2007, and Heph again in 2007. (AR

3). The AAO cited several of the documents recovered from Uzoma when Customs and Border

Patrol encountered him in March 2008. These documents supported the evidence that Uzoma had

engaged in four different computer sales over an eight-month period.

The AAO also cited a July 2008 commercial invoice from Heph charging Caller Spring

$42,000 for 40 computers. (AR 61). The invoice, the AAO found, showed that "the computers were

initially intended to be sold at a profit." (*Id.*). The computers were eventually sold at a loss for

$28,548, according to the affidavits and bank records. The AAO concluded that "[t]he fact that the

computers were ultimately sold at a loss, however, does not diminish the evidence that the

transaction was intended to be a profitable one or that the Beneficiary was engaged in secular

employment." (*Id.*). The evidence of these transactions, according to the AAO, contradicted

Uzoma's testimony that he was involved in Heph only on a limited basis, to help his friend with a

one-time transaction. "All of the order confirmations from Dell list Uzoma as the billing and

delivery contact for Heph. . . . it was Uzoma who contacted Mr. Okoronkwo's shipping agent to

arrange for the computers to be sent to Nigeria. The record therefore shows that, at a minimum, the

Beneficiary twice registered Heph with the clerk's office, ordered more than 60 computers from Dell

for over $47,000 on at least four separate occasions over an eight-month time period, arranged for them to be shipped to Nigeria, and was the billing and delivery contact person for all of the transactions." (*Id.*). Based on that evidence, the AAO explained, the Church failed to meet "its burden to show that [Uzoma] came to the United States to work solely in the vocation of a minister as specified under section 101(a)(27)(C)(ii)(I) of the Act . . . ." (AR 63) (alterations in original).

The Church appealed. On May 3, 2017, the AAO denied the appeal and the Church filed this lawsuit. (AR 5).

## II.    The Legal Standards

### A.    Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by showing an absence of evidence to support the nonmoving party's case. *Fret v. Melton Truck Lines, Inc.*, No. 17-50031, 2017 U.S. App. LEXIS 16912, at *5–6 (5th Cir. Sept. 1, 2017)

(quoting *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014) (citing *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). A fact is material if "its resolution could affect the outcome of the actions." *Aly v. City of Lake Jackson*, 605 Fed. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Parish Prison*, 663 Fed. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, LLC*, 642 Fed. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

**B.    Review of Agency Decisions**

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case on review is a question of law." *Id.* (quotation marks omitted). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

Under the APA, agency action may be held unlawful and set aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard is highly deferential." *Knapp v. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015) (quotation marks omitted). "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made . . . ." *Id.* (quotation marks omitted). Agency action is arbitrary and capricious "only when it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Wilson v. U.S. Dep't of Agric.*, 991 F.2d 1211, 1215 (5th Cir.1993) (quotation marks omitted). "The agency decision need only have a rational basis, and it does not have to be a decision which the court would have made." *Id.* In reviewing a challenge to the agency's decision, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Luminant Generation Co.,*

*LLC v. EPA*, 714 F.3d 841, 850 (5th Cir.2013) (alteration omitted) (quotation marks omitted).

"A denial by [the USCIS] of an application for a visa may be reversed only if the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Nat'l Hand Tool Corp. v. Pasquarell*, 889 F.2d 1472, 1475 (5th Cir. 1989) (citing 5 U.S.C. § 706(2)(a)). "It is well settled that the applicant for a visa bears the burden of establishing eligibility." *Id.* While the district court's role is to ensure that the USCIS engaged in "reasoned decision-making," the agency is "entitled to considerable deference in its interpretation of the governing statute." *Id.* (internal citations omitted).

## III. Analysis

### A. The Church's Motion

The Church moves for summary judgment, arguing that the only issue is whether Uzoma worked solely for the Church. The Church argues that the AAO abused its discretion by denying the I-360 petition based on the erroneous assumption that Uzoma did not work solely for the Church. The Church argues that the AAO interpreted and applied the applicable statutes too broadly, which was arbitrary and capricious. The Church argues that contrary to the agency's approach, the law prohibits a special-immigrant religious worker from engaging in secular *employment*, not from engaging in secular *activities*. The Church focuses on the different definitions of "employment" and "activities," arguing that "[t]here is no evidence of the beneficiary's employment outside the [Church]." (Docket Entry No. 22 at 9). The Church argues that the AAO would have reached the same result if Uzoma had volunteered at a food pantry.

The Church points to several portions of the AAO's decision that it disputes. First, the Church argues that the AAO misinterpreted the testimony of Uzoma's friend and computer-

transaction partner, John Baptiste Sekumade.  Another witness, regional pastor Ade Okonrende, signed a statement saying that Sekumade had testified that the transactions were not for profit.  The Church argues that Sekumade never said that.  The AAO considered and rejected this argument, explaining that:

> although the regional pastor claims that Mr. Sekumade stated in his affidavit that "this was not for profit," he made no such assertion, as we noted in our decision: "Mr. Sekumade, a co-owner of Heph, never says that Heph was started with no intention of making a profit."  We do not find the regional pastor's contentions to be sufficient in rebutting the other evidence in the case.

(AR 4).

The Church also argues that the AAO "clearly misinterpreted" Sekumade's original affidavit, which stated: "I responded to the Customs Officer that this shipment was not a business transaction but a shipment to a friend, and pointed out that the computers had a purchase invoice from Dell." (AR 75).  The government responds that the AAO noted the inconsistency between Okonrende's testimony that Sekumade had stated that the transaction was not for profit, and Sekumade's affidavit. The government, and the AAO, correctly read Sekumade's affidavit as stating only that the computer shipments were "not a business transaction," but not as stating that the shipments were not intended to make a profit.  The AAO nonetheless considered the Church's argument and, based on the inconsistency and other factors, declined to give Sekumade's testimony significant weight.  That choice was supported by the record and is well within the deference accorded the AAO's decision.

Second, the Church argues that the AAO "discounted the Central Bank of Nigeria Guidelines on International Money Transfer Services in Nigeria, which corroborated the [Church's] contention that an individual in Nigeria could only wire $2000 per day."  (Docket Entry No. 22 at 12).  On

appeal, the Church argued that the guideline limits on money transfers explained why Uzoma registered a business to help his friend, instead of helping him in a more direct fashion. The AAO considered this argument, noting that "the guidelines are 19 pages long and the [Church] has not clarified or explained which provision(s) would have hindered the transfer of monies between Mr. Okoronkwo and [Uzoma] without [Uzoma] registering a business." (AR 4). The AAO further noted that the only provision on wire transfers, section 3.6.1, mentions monetary limits but makes no distinction between individual and business recipients. (*Id.*). The AAO also explained that Heph repeatedly received wire transfers from Caller Spring for more than $2,000. For those reasons, the AAO explained that it found unpersuasive the Church's reliance on the guidelines to show that Uzoma needed to register a business. (AR 4). The record shows no error in the AAO's decision on the role of, and weight to be given, the guidelines.

The Church now argues that "[e]ven if the Central Bank of Nigeria guidelines does [sic] not specifically mentioned [sic] business as AAO indicated, the fact that it specifically mentioned a limit of $2,000; and the fact that a business, Caller Springs, was able to transfer amounts in excess of $2000 corroborates the Plaintiff [sic] assertion that only businesses could wire more than $2000." (Docket Entry No. 22 at 12). This argument is also unpersuasive. The AAO considered, analyzed, and declined to accept the Church's argument about the guidelines. The government argues, and the court agrees, that the AAO gave the appropriate weight to the guidelines' placement of a $2,000 limit on all transfers.

Third, the Church argues that the AAO discounted the Dell "chat" printout between Uzoma and a Dell representative. This "chat" allegedly corroborated Uzoma's argument that Dell would not sell more than five computers to an individual. The government argues that the AAO considered

15

the chat but gave it little weight, noting that it was undated and did not provide the support that the Church claimed. The AAO found that the chat showed that the purchase had to go through the Dell "Business Team," but it did not explain why Uzoma registered a business for the purchase. (AR 5). The chat states that any purchase of more than five computers had to be completed by the Dell "Business Team," but the chat does not state or suggest that Uzoma could purchase more than five computers only if he registered a business. (AR 44). The AAO considered the argument and the evidence the Church cited, but found it unpersuasive, which the record supports.

Fourth, the Church argues that the AAO improperly discounted the evidence in Uzoma's 2008 to 2011 tax returns, particularly the 2015 return, because they covered the period after his 2008 encounter with Border Patrol. The Church argues that Uzoma's tax returns from 2004 to 2011 were part of the record, but that the AAO improperly disregarded them.

The AAO specifically addressed the 2015 tax return, noting that it "significantly post-date[d] the relevant time period" and that Uzoma had stopped Heph activities after 2008. (AR 5). The government argues that the Church had the burden of showing that Uzoma worked solely for the Church during the two-year period immediately before filing the petition, from 2004 to 2006, making his 2015 tax return irrelevant. In addition, the May 2017 AAO decision addressed only the Church's newly submitted evidence, not the tax returns already in the record that had previously been fully considered. Again, the record supports the AAO's approach.

Fifth, the Church argues that the AAO relied on the Form I-213 in the record, but that "[t]here is nothing in the I-213 that controverts what the beneficiary as well as Mr. Sekumade has consistently been saying." (Docket Entry No. 22 at 13). The Form I-213 is a "Record of Deportable/Inadmissible Alien." It recorded Uzoma's March 2008 encounter with Customs and

Border Patrol in a cargo area in Houston. According to the form, Customs and Border Patrol Officer Nealy contacted the prosecutions unit about Uzoma after encountering him, checked his identification, and found that his R-1 status had expired. Officer Nealy's report noted that Uzoma had been engaging in unauthorized employment. Officer Nealy's report included copies of the business and credit cards that Uzoma was carrying when he was detained. The report contained information about Uzoma's statements about his computer business with Baptiste and the money he had received in exchange for shipping computers. (AR 1301). The AAO determined that the evidence Uzoma presented to explain the computer shipments did not sufficiently rebut the statements and evidence documented in the Form I-213.

Uzoma did not deny registering a business to purchase computers and ship them to Nigeria or partnering with Sekumade. Uzoma did not deny receiving money for the computers. He volunteered to provide bank statements showing the money he received for the shipments. The only issue, the Church argues, is Uzoma's motive for sending the computers, which multiple people have sworn was to help a friend, not to profit. The government responds that the record amply supports the AAO decision rejecting the Church's argument. The record evidence includes the business cards and documents the Border Patrol found, including a card listing Joel Uzoma as the "Managing Director" of "SiTech (Nigeria) Limited." The cards and documents contradicted Uzoma's claims that he had limited experience in computer transactions, (AR 1304), and the Church's position that he was working solely as a minister in 2008.

The AAO stated: "To be clear, we place particular emphasis on the Form I-213 in the record which has not been adequately rebutted." (AR 5). The AAO focused on the fact that Uzoma told the Customs and Border Patrol officer that he partnered with Sekumade in a computer business in

17

his "leisure time" and did not consider it "work." When asked to give an example of how much money he earned, Uzoma stated that he had shipped 20 computers in exchange for two wire transfers of $9,975 and $6,782, respectively. His statements that he "partnered" with a friend "in a computer business" that he did not consider work because he did it in his leisure time is evidence of secular employment. The example Uzoma gave of how much money he "earned" shipping computers to Nigeria is evidence of an intent to profit. The record amply supports the AAO's conclusion that this evidence outweighed, and had not been rebutted by, the evidence the Church presented. The AAO's conclusion is not arbitrary or capricious.

Finally, the Church argues that the AAO improperly discounted Uzoma's explanation that the wire-transfer notices and commercial invoices included customs duties and fines. The Church argues that Sekumade's affidavit explained that he told Customs and Border Patrol that the Dell order confirmations and Caller Spring's invoice were included because the shipments were not business transactions. The government responds that this argument does not show an abuse of agency discretion. In its decision, the AAO explained that it

> place[d] significant weight on the wire transfer notices, Heph bank account statements, Dell order confirmations, and Heph's commercial invoice to Caller's Spring in the record, all of which establish that [Uzoma] ordered more than 60 computers from Dell computers for over $47,000 on four occasions. For at least one of those orders, Heph attempted to make a profit, charging Caller's Spring $42,000 for $31,285.56 worth of computers.

(AR 5). This explanation and conclusion are supported by the record evidence.

The Church's argument boils down to the assertion that Uzoma's own affidavit and the affidavits from a friend in Nigeria and from Sekumade should outweigh the ample record evidence supporting the conclusion that the computer shipments were business transactions intended for profit

18

and that Uzoma was engaged in secular employment. The record does not show that the agency's decision was arbitrary or capricious.

### B.    The Government's Motion

In the cross-motion to which the Church did not respond, the government argues that the Church did not meet its burden to show that Uzoma came to the United States to work solely as a minister. 8 C.F.R. § 204.5(m)(7). For Uzoma to qualify for a religious-vocation visa, the Church had the burden of showing that he came to the United States to work solely as a minister and not in any secular employment. The government argues that the AAO considered all of the evidence, which supports the conclusion that Uzoma was not working solely in religious work or for the Church.

The government points to the ample evidence supporting the AAO's conclusion:

- Uzoma registered businesses on three separate occasions: Heph in 2004; Heph in 2007; and Cute Apparel in 2007, (AR 100, 149–50, 152);

- Uzoma had a credit card in his name for Cute Apparel when he was stopped by Border Patrol in 2008. (AR 73, 1305). Although Uzoma testified that he never used the card, he did not explain why he applied for, received, or carried it with him if he had no intention of using it, nor did he submit any billing statements to support his claim that he had never used it;[1]

- Uzoma's wife had registered Cute Apparel as a sole owner in October 2006 before Uzoma registered the business with his name in July 2007. Although his wife testified that his involvement was "just the courtesy of a woman that wants the backing of her spouse," (AR 104), the Church did not present evidence of what kind of "backing" Uzoma provided;

- Uzoma claimed that he registered Heph in 2004 because only a business could buy

---

[1]  At oral argument, the Church argued that the card was a debit card and it could not produce a statement that did not exist. This argument is unpersuasive because Uzoma could have presented documentation that he had never used the debit card or explained why he had it if he had no intention of using it.

more than 5 computers, which he planned to buy and send to Okoronkwo in Nigeria to re-sell. (AR 100). Nothing in the record supports the claim that an individual cannot purchase more than 5 computers without registering a business name;

- Okoronkwo updated his affidavit to state that Nigeria imposes a limit on the amount of money individuals can transfer per day, but that limit does not apply to businesses. (AR 77). Okoronkwo cited the Nigerian Anti-Money Laundering Act, but the Church did not submit any copy of the law to support this claim or specify the limits for individuals and businesses, respectively;

- the record evidence shows at least four shipments of computers to Nigeria within an 8-month period (AR 1307–08, 1310–25);

- a commercial invoice dated July 11, 2008 shows that Heph charged Caller Spring $42,000 for 40 computers (AR 221–22);

- order confirmations from Dell list Uzoma as the billing and delivery contact for Heph and Uzoma contacted Okoronkwo's shipping agent to send the computers to Nigeria (AR 1318–25);

- Uzoma registered Heph as a business twice, ordered more than 60 Dell computers for over $47,000 over 8 months in at least four different transactions; and

- Sekumade never stated that Heph was started with no intention of making a profit (AR 75).

This evidence, the government argues, support the AAO's conclusion that, based on the totality of the circumstances, the Church failed to meet its burden. The evidence showed that Uzoma had registered two businesses on three occasions and engaged in multiple commercial transactions for many thousands of dollars, and that he was engaged in secular employment, in violation of his visa restrictions.

Again, the record evidence supports the agency's determination. Uzoma bought a large number of computers in the U.S., sent them to Nigeria, and received wire transfers in return. On its face, this was a business. Uzoma's explanation is that he sent the computers for his friend and recouped only the costs of the computers and shipping. Considering that explanation with the

evidence of the credit cards, business cards, business registrations, and with Uzoma's own inconsistent statements, the agency determined that Uzoma had engaged in secular employment. The agency decision detailed "a rational connection" between the facts and the decision. The court's review is highly deferential. The agency decision was not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Wilson*, 991 F.2d at 1215. The agency's decision is well supported by the record evidence and was not arbitrary or capricious.

## IV.     Conclusion

The Church's motion for summary judgment, (Docket Entry No. 22), is denied. The government's motion for summary judgment, (Docket Entry No. 25), is granted. This case is dismissed, with prejudice. Final judgment is entered by separate order. Each party is to bear its own costs.

SIGNED on August 2, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge